310-0247, re Marriage of Mahatma Bavarian and Khalifa Charles K. Ervin v. Shahan Bavarian, held by Stephen Wakeman. The sheet. Thank you. May it please the Court. My name is Steve Wakeman. I'm the attorney who represents the appellant Bijan Bavarian. Seated at council table with me is Chris Sokin, my associate, who, although not arguing today, was the labor in force on the briefs for the appellant in this case. This case, I suggest, is a case that is really about bad faith, where the recipient of rehabilitative maintenance, who abandoned her plan of rehabilitation after only a few months, told no one, collected over $250,000 in rehabilitative maintenance for the better part of four years, then denied that she had ever agreed to go to Bradley to get an MBA, and now says that's because that's not in the order. Well, this was a 24-year marriage, wasn't it? It was approximately a 24-year marriage, that's correct. And the parties entered into a settlement, Your Honor, a settlement agreement that was put on the record before Judge Corey, in which they bargained for and agreed to a period of rehabilitative maintenance to enable Mahasty Bavarian to attend Bradley University to get an MBA. She already had a four-year business management degree from a university in Tehran, Iran, where this party emigrated from. So... And the earnings, there was quite a disparity between the earnings of the husband and the wife. There certainly was. The husband's earnings were around $300,000. The wife was making $9 an hour at the time of the divorce. And then after this four-year plus four-and-a-half-year period of rehabilitation in which she did not go to get her MBA, did not enroll at Bradley as was stated in the settlement agreement, never even, in fact, applied, she got two associate's degrees, one in the subject of which she already had a bachelor and the other in hospitality management. And then her job search, which consisted of three applications only over a four-and-a-half-year period in which the employer that hired her never bothered to even inquire as to her degree, basically hired her as a night clerk at a hotel, desk clerk at a hotel at $9 an hour, same as she was making before she undertook this plan of rehabilitation, which several months after she started it, she abandoned. You know, it's not unusual to pay maintenance in a situation where there's a 24-year marriage and there's a large disparity in the incomes. Is there? No, sir, there is not. And if this were a situation where the court had ordered indefinite maintenance or the parties had agreed to it, it would be different. But this was a case where the parties bargained for rehabilitative maintenance with a review at the end of that period and in which Mrs. Bavarian had agreed that she was going to participate in an MBA program to further her job opportunities. What would happen in a situation where, okay, we characterize it as rehabilitative maintenance, but normally that's reviewable on a day certain or at the option of one party or the other, particularly the paying party, but what would happen if the rehabilitation plan was not accomplished or failed or whatever? Does it mean that there can't be a recharacterization of maintenance? No, I don't think so at all. And I think you correctly pointed out what was done in this situation or what was intended in this situation. The intent was to give this Mrs. Bavarian an opportunity to enhance her education and enhance her employment skills so that she would be able to either be self-sufficient or qualify for a fairly high-paying job. Now, there was rehabilitation contemplated, and there's four years allowed to do this, a little over four years actually, and then there was a review contemplated at the end of that period. So as you correctly pointed out, if she attempted this rehabilitation, completed her MBA, and then found out that actually she could only make $50,000, there would still be, as you correctly point out, a substantial differential in the party's earning power, and the court could, on review at that point, then enter into some sort of supplemental maintenance under those circumstances. But that's not what happened here. What happened here was she not only did not enroll in Bradley, she didn't even apply to Bradley. She didn't even take the GMAT test or the GRE test that are the prerequisites to get into the MBA program at Bradley. She testified herself that she provided this information to her husband on her plan, what she wanted to do before this settlement that was put on record in this case, and then a few months later, still in 2005, the same year in which the parties were divorced, abandoned that rehabilitation plan. And I respectfully suggest that this is a case where, under the authority of other cases that have been handed down by this court, her failure to make reasonable efforts at rehabilitation or to become self-sufficient are a basis for the termination of rehabilitative maintenance. In re court right, in re marriage of McGorry are both cases handed down by this court where the court has found that where a maintenance recipient failed to make good faith efforts to become self-sufficient, it was appropriate to terminate maintenance. Well, in this judgment it said that there was going to be real rehabilitative maintenance, but it provided that the award would be reviewed in August of 2009, and the obligation paid further, and then I'm quoting, rehabilitative and or permanent maintenance. Isn't that what it says? It does say that, Your Honor. And it certainly contemplated the situation. That's not a surprise. Well, it is a surprise only in the sense that this lady abandoned her efforts. She was also under a court-ordered obligation as part of the settlement agreement to notify and to send proof of her registration for classes at Bradley to her husband, which she never did, never once. Were these provisions, this agreement, were they incorporated into the judgment? The settlement agreement was incorporated into the judgment. It specifically is referenced. The settlement was put on the record in this case. All the terms and provisions you're talking about. There's an ambiguity here. The ambiguity is that what was put on the record by Mahasty's counsel was that she was enrolled at ICC, that she intended to transfer to Bradley University and be full-time in January of 2006, and that she contemplated completing her education and finding full-time employment after her rehabilitation by the August of 2008 date, four and a half years down the road. Maybe it's 2009, whatever the date was. And that's what was put on the record. That was before a judge taking a transcript. That's correct. And that is before the court and was part of the record in this case. That's how it got before the court, because what does the judgment say? The judgment makes reference to rehabilitative maintenance in the amount of X dollars with a review at the end of such and such period. But no agreement incorporated attached there to the judgment? Well, the settlement agreement was approved by the court on the record, and Judge Corey specifically found that the parties had an agreement. He acknowledged that. However, there was, as far as the actual judgment, the husband in this case became unrepresentative, and he objected to the language of the judgment that was drafted by Mahasty's counsel. It did not specify these terms regarding rehabilitative maintenance. He was asking for additional time to hire additional counsel. He wrote counsel and actually wrote the court or faxed something to the court where he objected to the language of the judgment, but the court approved the judgment as written. It, however, didn't reference the settlement agreement that was read into the record. And that further obligation in August of 2009 would review further obligation to pay either rehabilitative and or permanent maintenance. Correct. And certainly the court could have determined upon review either that this woman has attempted rehabilitation but it can't be done or that she's made a good faith effort and she's partially rehabilitated and so she does not need this much money but she needs a different amount. The court could certainly have done that. How much money was she making? She is making $9 an hour, $18,000 a year, and he makes over $300,000. Currently, that's true. But that may be, but you're saying that the obligation to rehabilitate oneself, that the maintenance given was in exchange for a good faith effort to do better. Yes. To at least keep that differential from growing wider or reducing it. Is that correct? Absolutely. And Judge Dubicki, the trial judge, in fact, found that Mahasty Bavarian did not make reasonable efforts to become self-sufficient. Yet what he in effect did was take what the parties bargained for in terms of rehabilitative maintenance and made it permanent and, in fact, increased the amount from $4,000 a month to $4,700 a month. But didn't he also find that even if she got an MBA, that because of her age and other factors, that it probably wasn't going to increase her earning capacity very much anyway? He did not find that, Your Honor. He made no finding along those lines. What he did find was that had she completed some form of rehabilitation, whether that was the MBA or whether she had a four-year degree from Bradley, that she would have been making more in all likelihood than she was at the time going into this review hearing. He did not find that she would not have been making significantly more. He made no finding to that effect. Well, it was a maintenance set at a dollar figure but also a percentage of bonuses at some time, wasn't it? It was originally, but then he went to give us employment change and he moved to Florida. He was no longer receiving bonuses. So, in effect, what he did was, even though she collected over $250,000 in rehabilitative maintenance after she stopped any effort of rehabilitation, he ordered that the average of what his bonus income had been would be made retroactive maintenance. And he upped the amount to essentially $5,700 a month, thereby creating an arrearage of $1,700 a month from $4,000 to $5,700 for the 10 months that had gone that he had been paying the base amount without a bonus. So the alternative here would be for the court to do what the trial court did in Blum v. Foster, the 2009 Supreme Court decision, which basically held under somewhat similar facts where a woman who had a law degree had not made efforts to become self-sufficient. Counsel, you have two minutes. Thank you. The trial judge essentially reduced the maintenance, cut it from $8,600 to $3,500, but extended the term for an additional three years, presumably to give the woman an opportunity to rehabilitate or to get back on her feet. Judge Dubicki didn't either. He essentially took the bargain for rehabilitative maintenance and made it indefinite or permanent maintenance. And, in fact, when you add the amount, $4,700, to what she was making at $9 an hour, she had greater income after this ruling on review despite no efforts at rehabilitation than she had throughout the divorce. We also ask that the attorney's fees... What year in Iran? I cannot tell you the year. It was sometime in the 80s. It was, I believe, at or about or shortly after the revolution, the Islamic revolution. The husband had a similar degree, a medical degree, from Iran prior to that, and then following the revolution, the parties emigrated to... He emigrated to the United States. She followed a year or two later. It was at or about that time, Your Honor. And she had no education from that time to the time they got a divorce. Well, actually, she did. She had no degree beyond that, but she had something like 54 hours of community colleges towards a degree. But she had no other degree except the one from Iran. That is correct. Then she acquired two associate's degrees, one in business management where she already had the bachelor's and the other in hospitality management, which essentially created no benefit to her income potential. We also ask that the attorney's fees that were ordered to be paid here be reversed under the authority of N. Ray Reiner, this court's 2009 decision, on the basis that, number one, you have to show an inability to pay yourself to get the other party to pay, and also on the basis of the conduct or misconduct in this case, which we believe would warrant a reversal of that aspect of the decision as well. Thank you. Thank you, Counsel. Counsel, you may proceed. Thank you, Your Honor. Your Honors, may it please the Court. My name is Charles Jerrigan. I'm the attorney for the plaintiff, Appali Mahasi Deverian. It's a pleasure to be before you today. There was no plan of rehabilitation. That was agreed to by my client. There's nothing read into the record? What was read into the record, Your Honor, is accurately reflected in the judgment of dissolution of marriage. What counsel refers to as a plan of rehabilitation is essentially an attempt to include extrinsic evidence based upon prior discussions held before the parties in the months preceding the final settlement of the case, which are inadmissible. Counsel at trial and in their briefs, counsel for Dr. Deverian, have never shown this Court any ambiguity. In fact, in their reply brief, they even acknowledge, and I believe that the words of their reply brief are that the oral settlement agreement was clear, certain, and definite. I have a question. What's going on down there in the trial court? You've got a gentleman who's without an attorney who had one previously and is objecting. But not 15 separate ex parte communications with Judge Corey, and not one time did Dr. Deverian in those communications take issue with the absence of his alleged rehabilitation plan. They were all regarding his not wanting to pay what he was required to pay pursuant to the judgment along the time periods that he was required to do them. He kept asking for additional extensions of time to pay. Not once in those 15 ex parte communications did he ever raise this alleged rehabilitation plan. The only time this alleged rehabilitation plan ever was concocted and brought to light was four years later upon this review. Dr. Deverian had an attorney after the judgment of dissolution of marriage was entered, when he petitioned the Court for relief, asking for enforcement of the judgment terms against our client in regard to property-related matters, never brought up anything in regard to the language of the judgment of dissolution of marriage not containing this alleged rehabilitation plan. I submit to Your Honors that there was no plan of rehabilitation that my client agreed to. And if you think about it logically, it makes sense that she would not have agreed to something like that. She had not applied to a college. She was a student at Illinois Central College at the time the judgment was entered. She had not applied to college. She had not applied to any graduate schools. She had not taken the GRE. She had not taken the GMAT. She had no way of even knowing that she would qualify for those things. Why in the world would she agree for her rehabilitative maintenance to be tied to her completing an MBA program, when she didn't even know at that point in time whether she was able to do that? So where did all these provisions come from? Are they made out of old cloth? Is that what you're saying? I would just ask that Your Honor to look at the transcript of the oral settlement agreement. The language that's in there that talks about her attendance at ICC, full or part-time, and attendance at Bradley is framed with words of she contemplates doing that, she hopes to do it. There is nothing in that oral settlement that says that she agrees to do this in return for receiving rehabilitative maintenance. Basically, it was a comment by her counsel to explain why it was going to be reviewed in four years. She's hoping that she's going to do these things, and that at the end of the four years, we're coming in for a review. She did not agree to bind herself. Now, McGorry, that counsel for Dr. Bavarian cites, is a completely different case than this case in terms of the language of the judgment. In that case, the judgment was very specific that she was going to attend college, and that was a condition of her receipt of continuing rehabilitative maintenance. At this time where, I don't know if you were the trial counsel or not, it was a trial counsel representing Mahasty. Mahasty is presenting this to the court, am I correct? Her attorney presented, read the oral settlement agreement into the record. Dr. Bavarian and his attorney were present when it was read into the record. Okay. He was represented at that time, Your Honor. When it was read into the record. Absolutely. His attorney, Drew Cassidy, was present. He commented on the record himself on a few things in the settlement agreement. Both parties were represented. This was the agreement that was read into the record at that time, and that oral settlement agreement says nothing about her binding herself to a rehabilitation plan. That's at the prove-up. Absolutely. At the prove-up. Absolutely. And what happened to his lawyer before the judgment was made? I don't know why, but Mr. Cassidy withdrew. So between the prove-up and the judgment being entered, there was a withdrawal. That's correct. And there was a great deal of difficulty getting that judgment entered. Basically, it was Dr. Bavarian simply would never agree to it, arguing about the language, trying to renegotiate the property terms of the judgment, things of that nature. And finally, it was set for hearing and brought before Judge Corey. Judge Corey found the language of the judgment to be consistent with the settlement of the parties, and the judgment was entered. Dr. Bavarian, 30 days after the entry of the judgment, did not file a motion to reconsider or a motion to vacate. Dr. Bavarian did not file within two years of the entry of the judgment any motion directed to that judgment seeking relief. That judgment is final. The language of the judgment is clear. It's unambiguous. The trial court, quite frankly, should not have allowed the parole evidence, although I don't believe that this is Bavarian's counsel's objection to the evidence. So it did come in. Even if the court is to review that evidence, I think the court's going to find, as did the trial court, that Dr. Bavarian was not credible in his testimony. His English is difficult to understand on the record. It's a very difficult read. I went through the whole thing myself because I wasn't the attorney in the trial, and I probably lost a little more hair after reading it because of how difficult it was to go through it. But the simple fact is that his counsel was trying to get him to say that there was a meeting that occurred on the day of the settlement, at which time he was provided documents about MBA programs, about GREs, GMATs, and discussions were had about an MBA program at that time. Well, on cross-examination, it became clear that what Dr. Bavarian was talking about were conversations that had occurred months before. Documentation that Dr. Bavarian claims came from my client, Mahosky, did not, Dr. Bavarian admitted, did not in fact come from my client. It came from his own attorney. So basically, the bottom line is the trial court found Dr. Bavarian not to be credible on the issue of this plural evidence on additional terms to this agreement that did not exist. And the trial court basically found that there was no plan of rehabilitation. Now, moving on to my client's efforts. As the courts noted, my client at the time of divorce was a 47-year-old Iranian woman who came to this country along with her husband, Dr. Bavarian. Instead of developing her own career, she sacrificed her career to raise the party's two children and to support Dr. Bavarian in the furtherance of his career, which included getting himself licensed as a doctor in the United States and all the work that he had to do that, which was not an easy task for him to do. Throughout the marriage, my client did not work in any meaningful jobs whatsoever, only part-time positions of very little pay, did nothing basically that developed any type of a career for herself. Toward the end of the marriage, immediately prior to the divorce, I believe, my client did begin to take classes at Illinois Central College toward her degree in business management that she did finally achieve post-decree. Dr. Bavarian's income, as the court has noted, is about $325,000 a year. My client's income at the time of divorce, she was working part-time and making basically just a hair over minimum wage with no benefits whatsoever. After the judgment was entered, my client completed her associate's degree in business administration, business management, excuse me, business administration, and then began embarked on a course of completing a second two-year degree in hospitality management. She attempted and communicated with Bradley about trying to enter their MBA program. She discovered that her Iranian degree, she could not, she communicated with her school in Iran, they would not provide her with any evidence that she had completed that degree. That testimony stands unrebutted in the record. She was unable to get any proof that she had actually achieved a degree in Iran. Bradley University required proof of that degree. There was testimony of Lynn Franks, admissions director of Bradley, that Dr. Bavarian brought to trial and had testified. And she acknowledged that although my client could have gained provisional admission, only in certain special circumstances will they allow actual admission. My client testified that the individual she spoke with at Bradley, both Bradley and the University of Illinois at Springfield, I believe it was, indicated to her that without proof of that degree, she would not be able to gain admission. So she instead decided to complete a second associate's degree at Illinois Central College in hospitality management and enter a field that she had interest in, which is hospitality management. Within a short time after achieving her degree, and by the way, all the time that she was going to ICC, she was also working for a short time, part time, and then she worked full time. So this isn't a case where she was just sitting back and enjoying her maintenance as Dr. Bavarian would try to get this court to believe. She was working. She was supporting herself as well, supplementing the maintenance that she was receiving while she was going to school as well. She achieved a second degree. She applied to, I believe it was three different jobs, and she landed her job. She got a job with the Fairfield Inn and Suites by Marriott. Her testimony was that as a, at the time, 50-year-old woman of foreign nationality with the education, the lack of education, and the lack of work experience that she had, she was basically looking at entry-level positions. She wasn't going to come off, you know, even with her college degree, she wasn't going to come out and, you know, after being out of the workforce for 24 1⁄2 years, she wasn't going to come out and land a $50,000 a year job. She was looking at entry levels. She got her entry-level job, and her testimony was that this job provided her with full-time work plus benefits, which she didn't have at the time of the divorce, so there is a difference in her compensation, although generally she's making about the same dollar amount of money she has benefits now, which she didn't have before, which are important to her, because otherwise she wouldn't have health insurance, and we all know what health insurance costs these days. So she gets her job. Her testimony was that she took this entry-level position because she felt it would benefit her from the standpoint of being able to advance within that position and hopefully manage a hotel at some point in the near future. But basically in her situation with her education, lack of any meaningful work experience, entry level is what she was looking at, and that's what she found. The trial court basically found that her attempts at rehabilitation, although she didn't make every attempt, the court found her attempts to be reasonable in light of the circumstances. The court did make a comment that her not going for the MBA degree was somewhat reasonable in light of the difficulties that she faced in regard to the proof of her prior education. The question here is, would no reasonable person agree with the trial court? Was the trial court's decision an abuse of discretion? I submit to this court that it certainly was not. The McGorry case, the Courtright case, the Koenigsegg case, the Clark case, the Cantrell case, all are cases where this court affirmed the trial court's termination of maintenance. The circumstances of those cases were egregious. Those were cases where maintenance recipients truly were not doing anything. You had people that got college degrees, and then instead of going out and getting a job, they decided to run their own business and then lost money for several consecutive years. I believe two of the cases are in that. As I indicated before, the McGorry case was a case where the wife was actually required as part of the terms of her rehabilitation award to gain her education. So that was specifically stated in the judgment. These cases are really distinct. I would submit to the court that the Fourth District case of Culp is probably more in line with this case. It involves a situation where there was a significant income disparity, where there's a 24-year marriage, I believe, in Culp similar to this case. And actually in Culp, where the award of permanent maintenance was affirmed, the wife in that case had actually had somewhat of a career during the marriage, as opposed to this case where my client basically had no career. So essentially there was no abuse discretion. On the attorney's fees, I believe the case law that the counsel cites and other case law that I cite in my brief states that inability to pay doesn't mean that you have to be destitute before you're awarded attorney's fees. It just means that paying fees would undermine and strip your means of support. In this case, although there was not an evidentiary hearing on fees, the court had before my client's financial affidavit, which the court found vehemently reasonable. The court even found that my client's expense, monthly expenses, actually were below what the court felt that her lifestyle should have been given the lifestyle of the parties during the marriage. The court found that her assets were less than the defendant's, and the court found that a $20,000 fee award, which basically put her in parity with what Dr. Bavarian's fees were, was reasonable and was warranted under the circumstances. Again, given the facts before the court in regard to, and also her monthly after-tax income was actually slightly less than her expenses. So from that perspective, which the court found to be truthful and reasonable, and from that perspective, it certainly appeared that requiring her to pay a bulk of attorney's fees would have... So the attorney's fees, he did just a little bit more than half of... 55%. About what the attorney was charging, and more in line with the other side's fees. Basically, as I understood it, he basically used the other side's fees as what was reasonable, as a reasonable standard, and then took what my client had already paid our firm, and then equalized them, or just basically ordered Dr. Bavarian to pay the difference up to the amount that he paid. Thank you. Thank you, Your Honor. Thank you. Counselor, you may proceed. Thank you. I suggest that the actual provisions of the settlement in terms of what was contemplated as far as rehabilitation was ambiguous here. And indeed, with regard to that issue, Judge Dubicki himself found and commented that her intention, at a minimum, was to obtain a four-year degree. Whether it was to go to the MBA program was ambiguous. Following the prove-up, which was held on the record at which Dr. Bavarian was represented at counsel, the judgment was later entered, months later, in which he was not represented. To say that he did not object to this language is incorrect. He wrote to Mr. Hasselberg at page 842 of the appendix, complaining about the failure to include provisions about the MBA program. Please add to section H3 the following. Mahosky already has a business accounting bachelor degree from Tehran Accounting School. She has the potential to find a job with a pay of $40,000 to $50,000 annually at this moment. As she desired to obtain Master of Business Accounting from Bradley University, she only needs 30 credit hours to achieve the degree. It goes on, and then he says, please add an enforcement clause for failure to pass the MBA courses. That's what he wrote specifically to Mr. Hasselberg about, complaining about the language of the judgment. He also then wrote to Judge Corey, complaining at pages 837 in the appendix, complaining that the language of the proposed judgment was false, inaccurate, and twisted document. Now, both of these folks are of foreign descent. Their English is a little bit difficult, and their understanding of how our court system works is a little difficult as well, or they have some difficulty with it. But the fact of the matter is this went down at a time, the judgment order, when Dr. Bavarian was under unrepresented, and to say that he raised no objections to the language of the judgment is just patently false. Now, there were also some statements made by Mr. Urban, suggesting, well, that Mrs. Bavarian never really committed to these things, and, well, Mr. Bavarian's credibility may not be the best. A218 of the appendix is a copy of the brochure describing Bradley's MBA program that Mahasi Bavarian gave to her husband before the settlement agreement was reached, before the settlement was put on the record. And she confirms her intentions to obtain an MBA after that in an email, which was in evidence, and it's A219 of the abstract. I need my transcripts to sign up for classes for requirement credits for my MBA program. So there really isn't any dispute here. Although I submit it was ambiguous, the evidence in this court can consider de novo what the terms were of this oral agreement. It's really not in dispute. Finally, to suggest, as counsel did, that Judge Dubicki found that she made reasonable efforts to rehabilitate is just not correct. Judge Dubicki specifically found that she did not make all reasonable efforts to become self-sufficient, and that is found at page 183 of the appendix. So, in sum, there is a basis here, and so as not to set a precedent with regard to people exercising bad faith with regard to rehabilitative maintenance, there is precedent in the decisions of this court to terminate that, where, in this case, she has exercised bad faith, abandoned her rehabilitation program, did not tell the court, did not tell her husband, never provided proof of her enrollment as she agreed in the settlement agreement to do. Thank you. And basically pocketed for four years over $250,000 in rehabilitative maintenance payments, never made those tuition payments to Bradley, and then comes in and says, I should receive indefinite permanent maintenance. Alternatively, this court could basically reverse Judge Dubicki's decision on the indefinite maintenance, give her, let's say, an additional two years and substantially reduce the amount of maintenance necessary to attempt rehabilitation or to show why she is unable to do so. In short, we asked the court for a reversal of the judgments with regard to the awarding of the indefinite maintenance, the retroactive maintenance, and the award of attorney's fees, and we asked that the court basically terminate the rehabilitative maintenance for failure to exercise good faith in attempting a plan of rehabilitation or alternatively remand with instructions to give her an additional two years and a substantially reduced figure and reverse the decisions with regard to the retroactive maintenance given that she was not participating in rehabilitation and reverse regarding the award of attorney's fees. Thank you, counsel. Thank you, Your Honor. The court will take this case under advisement and